ACCEPTED
14-14-00807-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
9/24/2015 7:16:21 PM
CHRISTOPHER PRINE
CLERK

# No. 14-14-00807-CV

_____

IN THE COURT OF APPEALS
FOR THE FOURTEENTH DISTRICT OF TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
9/24/2015 7:16:21 PM
CHRISTOPHER A. PRINE
Clerk

_____

THE PETROLEUM WORKERS UNION OF THE REPUBLIC OF MEXICO,
APPELLANT

V.

JAMES GOMEZ, AS RECEIVER FOR ARRIBA LIMITED, AND CARLOS RYERSON,
APPELLEES

_____

On Appeal from the 281st Judicial District Court
Harris County, Texas, the Hon. Sylvia A. Matthews presiding
Trial Court Cause No. 1985-35446-AC

_____

### APPELLEE'S BRIEF OF JAMES GOMEZ, AS RECEIVER FOR ARRIBA LIMITED

Brian A. Calhoun
State Bar No. 24044827
CALHOUN, BHELLA & SECHREST, LLP
325 N. St. Paul St., Suite 2300
Dallas, Texas 75201
(214) 981-9258
(214) 981-9203 (facsimile)
bcalhoun@cbsattorneys.com

Steven Ward Williams
SMITH SOVIK KENDRICK & SUGNET, PC
250 S. Clinton Street, Suite 600
Syracuse, New York 13202
(315) 474-2911
(315) 474-6015 (facsimile)
swilliams@smithsovik.com

Michael J. Pérez
Jeffrey A. Feasby
PEREZ & WILSON, INC.
750 B Street, Suite 3300
San Diego, California 92101
(619) 741-0282
(619) 460-0437 (facsimile)
perez@perezwilson.com

**ATTORNEYS FOR
APPELLEE/CROSS-APPELLANT
JAMES GOMEZ, AS RECEIVER
FOR ARRIBA LIMITED**

**Oral Argument Requested**

## ABBREVIATIONS AND RECORD REFERENCES

### PARTY ABBREVIATIONS

Appellee/Cross-Appellant James Gomez, as Receiver for Arriba Limited, is referred to herein as "Arriba."

James Gomez, as an individual, is referred to herein as "Gomez."

Appellant The Petroleum Workers Union of the Republic of Mexico is referred to herein as the "Union." In the record, the Union is sometimes referred to by its Spanish name, the "Sindicato."

Appellee/Cross-Appellant Carlos Ryerson is referred to herein as "Ryerson."

### RECORD REFERENCES

References to the Original Clerk's Record, which was submitted by the Clerk of the Harris County District Court, are in the form ([vol.#] CR [page #]).

References to the Reporter's Record are in the form ([vol. #] RR [page #]).

Citations to trial exhibits will refer to the page of the PDF document for Reporter's Record Volumes in the form ([vol. #] RR [PDF page #], [Ex. #]).

# TABLE OF CONTENTS

ABBREVIATIONS AND RECORD REFERENCES ............................................. i

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF FACTS ..................................................................1

    I.    INTRODUCTION .................................................................1

    II.   THE PARTIES' AGREEMENT ....................................................4

SUMMARY OF ARGUMENTS .........................................................10

ARGUMENTS AND AUTHORITY ......................................................15

    I.    The Union Cannot Rely on a Foreign Declaration that Has Not Been Properly Sworn or Translated to Invalidate the Settlement Agreement ...............................15

    II.   The Union's Mexican Judgment is Not a "Money Judgment" as Required to Be Enforceable Under the UFCMJRA ...................................................18

    III.  Arriba Presented Overwhelming Evidence of Actual and Apparent Authority Sufficient to Overcome the Union's Legal Sufficiency Challenge .........................23

        A.  The Union Has Failed to Establish that Mexican Law Applies to Determine the Issue of Authority .................................................................24

        B.  The Evidence Establishes that Ryerson and Alvarez Both Had Actual Authority to Bind the Union to the Settlement Agreement .............................28

        C.  The Evidence Establishes that Alvarez and Ryerson Both Had Apparent Authority to Bind the Union to the Settlement Agreement .............................38

            1.    The Union's Lack of Ordinary Care Led Arriba to Believe that Ryerson and Alvarez had Authority to Enter Into the Settlement Agreement…………………………………………………………………...40

            2.    Arriba Justifiably Relied on the Union's Lack of Ordinary Care to Its Detriment……………………………………………………………41

3. The Union Had Full Knowledge That Ryerson and Alvarez Were Acting on Its Behalf…………………………………………………42

IV. The Settlement Agreement is Supported by Adequate Consideration ..........43

V. The Union Has Failed to Establish a Basis for the Court to Reverse and Remand for a New Trial...................................................................................45

A. The Trial Court Did Not Abuse Its Discretion in Excluding the Union's Evidence Regarding Mexican Law ................................................................45

B. Any Error in Instructing the Jury Regarding Apparent Authority, if Any, Was Harmless..................................................................................................46

C. The Evidence Was Factually Sufficient to Support the Jury's Findings on Actual and Apparent Authority......................................................................49

D. The Trial Court Did Not Error in Denying the Union's Motion for Mistrial 49

E. The Court Properly Refused to Instruct the Jury Regarding the Union's Counterclaims ................................................................................................53

CONCLUSION AND PRAYER ........................................................................57

CERTIFICATE OF COMPLIANCE.................................................................59

# TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Raposa*, 560 S.W.2d 106
(Tex. App. – Fort Worth 1977, writ dism'd) ........................................................63

*Am. Med. Techs., Inc. v. Miller*, 149 S.W.3d 265
(Tex. App. – Houston [14th Dist.] 2004, no pet.) ................................................30

*Birdwell v. Birdwell*, 819 S.W.2d 223
(Tex. App. – Fort Worth 1991, writ denied) .......................................................48

*Blockbuster, Inc. v. C-Span Entertainment, Inc.*, 276 S.W.3d 482
(Tex. App. – Dallas 2008, pet. granted) ..............................................................48

*Brosseau v. Ranzau*, 81 S.W.3d 381
(Tex. App. – Beaumont 2001, pet. denied) ............................................ 22, 23, 24

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) .................... 28, 29

*Chandler v. Cashway Bldg. Materials, Inc.*, 584 S.W.2d 950
(Tex. Civ. App. – El Paso 1979, no writ) ....................................................... 64, 65

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005) .................................... passim

*City of Roanoke v. Town of Westlake*, 111 S.W.3d 617
(Tex. App. – Fort Worth 2003, pet. denied) ........................................................40

*Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851 (Tex. 2009) .52

*Courage Co. v. Chemshare Corp.*, 93 S.W.3d 323
(Tex. App. – Houst. [14th Dist.] 2002, no pet.) ..................................................19

*Crescendo Invs. v. Brice*, 61 S.W.3d 465
(Tex. App. – San Antonio 2001, pet. denied)......................................................53

*D'Angelo v. Petroleos Mexicanos*, 422 F.Supp. 1280 (D. Del. 1976) ............. 17, 18

*Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985) ........... 50, 57

*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984) ......................... 30, 31

*Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007) ............................................. 44, 47, 53

*Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887 (Tex. 2000)............. 50, 51

*In re City of Houston*, 418 S.W.3d 388
(Tex. App. – Houston [1st Dist.] 2013, orig. proceeding) ...................................58

*In re Morgan Stanley Co.*, 293 S.W.3d 182 (Tex. 2009) ........................................29

*La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674 (Tex. 1998) .....................................52

*Lester v. First American Bank*, 866 S.W.2d 361
(Tex. App. – Waco 1993, writ denied)..................................................................29

*Lewis v. United Parcel Serv., Inc.*, 175 S.W.3d 811
(Tex. App. – Houston [1st Dist.] 2004, pet. denied) ............................................56

*Miles v. Ford Motor Co.*, 914 S.W.2d 135 (Tex. 1995) ........................................23

*Peerless Oil & Gas Co. v. Teas*, 138 S.W.2d 637
(Tex. Civ. App. – San Antonio 1940, jdgmt. aff'd.) ............................................65

*Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*, 2012 WL 967301
(S.D.N.Y. 2012)....................................................................................................30

*Reliant Energy Servs. v. Cotton Valley Compression, LLC*, 336 S.W.3d 764
(Tex. App. – Houston [1st Dist.] 2011, no pet.).......................................... passim

*Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492 (Tex. 1991) .......................48

*Scottsdale Ins. Co. v. Nat'l Emerg. Servs., Inc.* 175 S.W.3d 284
(Tex. App. – Houston [1st Dist.] 2004, pet. denied) ............................................31

*Siko Ventures v. Argyll Equities, LLC*, 2005 U.S. Dist. LEXIS 21257
(W.D. Tex. 2005).......................................................................................... 20, 21, 22

*Suarez v. Jordan*, 35 S.W.3d 268
(Tex. App.—Houston [14th Dist.] 2000, no pet.) .................................................32

*Texas Commerce Bank N.A. v. Tripp*, 516 S.W.2d 256
(Tex. Civ. App. – Fort Worth 1974, writ dism'd.)........................................ 63, 64

*Thota v. Young*, 366 S.W.3d 678 (Tex. 2012) ...................................................... 52, 53

*Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc.*,
246 S.W.3d 42 (Tex. 2008) ...................................................................................27

*United States v. Pink*, 315 U.S. 203 (1942) ...................................................... 17, 18

*Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538
(Tex. App. – Houston [14th Dist.] 2003, no pet.) ................................... 32, 43, 44

**Statutes**

Texas Civil Practice & Remedies Code § 36.001.............................................. 11, 19

Texas Civil Practice & Remedies Code § 36.005....................................................24

Texas Civil Practice & Remedies Code § 132.001..................................................16

**Rules**

Texas Rules of Appellate Procedure 44.1.................................................... 53, 61, 63

Texas Rule of Civil Procedure 193.6......................................................................59

Texas Rule of Evidence 401 ..................................................................................51

Texas Rule of Evidence 402 ..................................................................................51

Texas Rule of Evidence 403 ..................................................................................51

Texas Rule of Evidence 1009 ................................................................................16

## STATEMENT OF FACTS

### I. INTRODUCTION

The parties came together in the early 1980s when The Petroleum Workers Union of the Republic of Mexico (the "Union," also referred to by its Spanish name, the "Sindicato") and two respected American businessmen from Texas, Bill Flanigan and David Black, agreed pursuant to a written contract for the purchase and sale of "residual" oil. (8 RR 14-18.) In order to consummate the contract, the Union insisted that the Americans form a company in the Bahamas, which resulted in the creation of Arriba, Limited ("Arriba"). (*Id*. at 17.) Thereafter, the Union breached that agreement, and the initial lawsuit between the parties ensued. (*Id*. at 19-20.)

Filed in 1985, the underlying action resulted in a judgment in 1986 in favor of Arriba and against the Union and various individuals (the "1986 Judgment"). (18A RR 8-12 [PX 1].) That judgment awarded Arriba $33 million in actual damages resulting from the Union's breach of contract, $266,000 in consequential damages resulting from the Union's breach of contract, $4 million in attorneys' fees, $5 million in actual damages resulting from the defendants' conspiracy to deprive Arriba "of the benefits of its contract and the perpetration of unlawful and tortious acts" upon Arriba, and $50 million in punitive damages. (*Id*.)

1

The present iteration of this case deals with the enforceability of a settlement agreement entered into by and between Arriba and the Union.[1] In 2003, Arriba garnished $43 million of Union funds that had been deposited in New York. Tied to a larger election fraud scandal in Mexico known as "Pemexgate," the Union's leadership was indicted for embezzling the $43 million. The $43 million had also been restrained by the United States District Court in New York at the request of the United States government, which was acting at the request of the Republic of Mexico. The settlement between Arriba and the Union was the direct result of that garnishment of Union funds, and the settlement agreement was reached while the $43 million remained in dispute and beyond the reach of the Union.

Embarrassed by the scandal, the President of Mexico enlisted the Union's founder to seek to resolve the garnishment and return some of the money to Mexico. Union representatives reached out to the Union's long-time attorney for the Arriba matters, Carlos Ryerson ("Ryerson"), who was able to negotiate a settlement with Arriba.

---

[1] The underlying 1986 Judgment has spawned numerous garnishment actions on the underlying judgment, as well as related state court actions, appeals to this Court as well as the First and Tenth Courts of Appeals, federal actions in Texas and New York, a state court action in California, and proceedings in the Bahamas. In the event the Court affirms the trial court's judgment, all of the other cases would then also be resolved in their entirety.

The trial below resulted from the Union's contention that Ryerson and the Union representative who signed the settlement agreement did not have actual or apparent authority to enter into the settlement agreement on behalf of the Union. A related question was whether this Union official had actual or apparent authority to sign a separate fee agreement with Ryerson. The jury found for Arriba and Ryerson and against the Union on all issues submitted to it.

The parties are before this Court on their respective appeals from the Final Judgment that was entered by the trial court based upon the jury's verdict in favor of Arriba and Ryerson. (*See* 14 CR 7626-7637; 8019-8020.) The Union's opening brief raises a myriad of arguments as to why it thinks the Final Judgment should be reversed. None of these arguments have merit. Substantial evidence supported the jury's determination of actual and apparent authority. In addition, there were no errors of law that caused the rendition of an improper judgment. For these reasons, and for the reasons set forth more fully below, the trial court's judgment should be affirmed on all points raised in the Union's appeal.

## II. THE PARTIES' AGREEMENT

On May 21, 2004, Arriba and the Union entered into an Agreement Regarding Disposition of Garnished Funds (the "Settlement Agreement").[2] (*See* 18B RR 59 [DX 50].) In entering into the Settlement Agreement, the parties sought to resolve the distribution of the funds located in New York that were the subject of the underlying garnishment action, the enforceability of the 1986 Judgment, and the outstanding issues in the 1989 Litigation. (*Id*. at 60.) The Settlement Agreement was signed by James Gomez as Receiver for Arriba and by Noe Manuel Moreno Alvarez ("Alvarez") as General Attorney in Fact for the Union, and by Ryerson as Attorney of Record for the Union. (*See id*. at 68-69.)

Dating back to 1990, Ryerson was constantly the Union's attorney and was tasked with resolving all of the pending litigation with Arriba. (8 RR 55-57, 70; 11 RR 153-156.) The Union's own witnesses testified to this fact. (10 RR 252-253; 12 RR 19.) Indeed, Arriba dealt with Ryerson over the course of the 14 years preceding the negotiation and execution of the Settlement Agreement. (8 RR 71-72, 184-185.) Ryerson was hired by Ruben Choreño ("Choreño"), who was the Union's long-time attorney under a broad general power of attorney that Ryerson

---

[2] The Union also entered into an agreement with Ryerson which provided for payment of his attorney's fees from the Union's 48% share of the garnished funds held in New York. (*See* 18A RR 44 [PX 15].)

had seen firsthand. (12 RR 114-115.)  Ryerson had a written contract with the Union reflecting his authority to act as the Union's attorney with regard to the Arriba matters.  (10 RR 257-258.)  Consequently, Ryerson openly and continuously represented the Union from 1990 until December 2004 (i.e., six months after the Settlement Agreement had been entered).  Indeed, Ryerson represented and was present for the Union at another trial against Arriba in 1997.  (8 RR 57; 13 RR 119, 138.)  By agreement with the Union and Enron, Ryerson even continued to represent the Union after he went to work for Enron.  (8 RR 61; 13 RR 138.)

Ryerson's representation was not terminated until December 2004 – shortly after the Union had affirmed in writing his authority as counsel for the Union.  (*See* 11 RR 8-9, 52-53, 57, 67-68, 257; 12 RR 61.)  However, from 1990 through December 2004, Ryerson was a constant as the Union's primary attorney in the Arriba matters.  (8 RR 71-72, 184-185.)  For his work as the Union's attorney, Ryerson was paid millions of dollars.  (11 RR 251-252.)

By 2002, Carlos Romero Deschamps ("Deschamps") and the number two person at the Union, Ricardo Aldana Prieto ("Prieto"), had been indicted in Mexico for embezzling $43 million in Union funds that were seized in a New York bank account at the Pershing Division of Donaldson, Lufkin & Jenrette Securities, for electoral fraud, and for violation of public trust.  (10 RR 249-250; 11 RR 169-171.)

5

Ryerson had previously witnessed Deschamps' corruption firsthand. In particular, Ryerson testified that under one of the modifications to his contract with the Union he was supposed to be paid $3.5 million. However, shortly after he signed the contract, he was told by one of the Union's attorneys, and a witness at the trial below, Eduardo Gonzalez, that he would only be receiving $1 million of the $3.5 million. (12 RR 98.) Thereafter, Ryerson was instructed to go to a Banamex Bank in Mexico City to collect his payment. Since Ryerson was concerned that the U.S. Internal Revenue Service might tax him for $3.5 million in income, Ryerson brought along a witness to confirm that he only received actual payment of $1 million. (12 RR 100-101.) While Ryerson was in a private room at the bank he saw Deschamps and the Union's treasurer, Alejandra Michel, in another room catty-corner to his. (*Id.* at 28-29; 99-100.) A bank official brought Ryerson a check in the amount of the Mexican peso equivalent of $3.5 million for him to endorse. A large sum of cash was then brought into Ryerson's room. At the same time, Ryerson observed Deschamps and Michel in their room counting cash. (*Id.* at 101-102.) In the end, Ryerson was only given $1 million of the $3.5 million he was owed. Deschamps took the remaining $2.5 million in cash. (12 RR 133-134.)

In light of the charges brought as a result of Pemexgate, Deschamps and Prieto lost their authority to act on behalf of the Union. (10 RR 221-222; 11 RR

209.) The Union's leadership was in turmoil. (11 RR 171-172.) Compounding this chaos, Arriba was able to garnish the $43 million based on the 1986 Judgment. (1 CR 27, 37-38.) The Union was desperate to get at least a portion of that money back.

As a result, Ryerson was approached by Choreño, who was retained and continued to work for the Union by grant of a valid general power of attorney. (11 RR 172-173.) Choreño was acting at the request of Joaquin Hernandez Galicia, known as "La Quiña," who was the founder of the Union. (11 RR 174-175.) The then President of Mexico, Vincente Fox, had tasked La Quiña and Choreño with handling the issues with the Union and Pemex to ensure that at least some of the money in New York would go back to the Union. (11 RR 177-178; 12 RR 112, 138-139.)

Ryerson was directed to deal specifically with Alvarez as the Union's representative. (11 RR 206-207.) Ryerson was given specific written instructions by Alvarez, on behalf of the Union, to "take all necessary measures to bring to a good conclusion the negotiations as may be pertinent … with the representative(s) of the company 'Arriba limited.' " (18A RR 45 [PX 16].) To this end, Ryerson was presented with a written power of attorney issued by the Union in favor of Alvarez.

(11 RR 182-183.)   Ryerson did as directed, and negotiated and entered into the Settlement Agreement on behalf of the Union.   (11 RR 180-182; 12 RR 119-120.)

Pursuant to Article III of the Settlement Agreement, the garnished funds in New York "*shall be distributed as follows*:

"A.   Fifty-Two percent (52%) of said funds shall be paid to Gomez, as Receiver for the Companies; and

"B.   Forty-Eight percent (48%) of said funds shall be paid to the Union or its designee (as directed by the Union's attorney of record herein); and

"C.   From the Union's 48% of said funds, an additional amount of One Million and No/100 Dollars ($1,000,000.00) shall be paid to Gomez, as Receiver for the Companies."[3]

(18B RR 61-62 [DX 50].)   This contractual agreement was beneficial to the Union since it guaranteed at least a portion of the $43 million would be returned to the Union which would have otherwise gone in its entirety to Arriba in light of the garnishment.

Article IV affirms the validity of the 1986 Judgment, and provides that "the Union and the Commission[4] hereby knowingly waive, and forever relinquish, any and all claims and allegations challenging the finality of the 1986 Judgment as it

_____

[3] This additional $1 million was to pay the expenses he had incurred as Receiver for Arriba.   (8 RR 264-265; 9 RR 89.)

[4] The "Commission" is The Commission of Contracts of the Executive Committee of the Petroleum Workers Union of the Republic of Mexico, which is also a judgment debtor on the 1986 Judgment.

8

affects them." (*Id*. at 62.) Article IV further provides that if "the distribution of the Garnished Funds is not accomplished according to the terms set out in this Agreement [ ], Gomez and [Arriba] shall be entitled to enforce the 1986 Judgment in any legal manner, anywhere in the world, except in the country of Mexico." (*Id*.) This provision was also beneficial to the Union because it allowed the Union to place its Mexican assets beyond the reach of Arriba.

Article V provides for the dismissal of a related case brought by Arriba against the Union that is currently pending with the trial court. (*Id*. at 63.) This also benefited the Union. As noted above, if the trial court's judgment is affirmed and the Settlement Agreement is enforced, this related case would be dismissed. Finally, the Settlement Agreement contains a Texas choice-of-law provision that expressly states: "This Agreement shall be governed by and construed in accordance with the laws of the State of Texas." (*Id*. at 67.) The Settlement Agreement also requires that any dispute arising out of the agreement be resolved ***exclusively*** in the District Court in Houston, Harris County, Texas. (*Id*.)[5]

---

[5] Arriba's Opening Brief as Appellant contains a detailed recitation of the procedural history of these cases. Rather than restate that history here, Arriba incorporates that section by this reference as if set forth fully herein.

## SUMMARY OF ARGUMENTS

The Union has been playing a shell game. It enters into contracts, takes advantage of those agreements, and then breaches the agreements when it unilaterally deems that it no longer wishes to comply with the terms of its contracts. Like any good shell game, the "confidence" trick is to vest individuals with a power of attorney to act on behalf of the Union, clothe those individuals in every way as actual agents with full authority, then disavow any knowledge of those agents' actions when it suits the Union. In this case, the Union is attempting to disavow written powers of attorney by ignoring the plain language of its contract with Arriba requiring Texas law to govern, and insisting that Mexican law and Mexican courts have the authority to invalidate the agreement between the parties. Arriba is the victim of the Union's shell game. However, our American courts can and must put an end to the Union's sleight of hand. A contract is a contract. In Texas, contracts are enforced.

Counter to the belief that bargained for agreements between two parties must be enforced, the Union argues that both the 1984 contract with Arriba and the May 21, 2004 Settlement Agreement are illegal under Mexican law. However, Mexican law does not apply to the determination regarding the legality of the 1984 agreement or the Settlement Agreement because both agreements contain Texas

choice-of-law provisions. The Uniform Foreign-Country Money Judgments Recognition Act ("UFCMJRA") does not apply to the Union's Mexican Judgment because it is not a money judgment. By its terms, the UFCMJRA only applies to foreign country judgments "granting or denying a sum of money." Tex. Civ. Prac. & Rem. Code § 36.001.

Next, the Union makes the same argument several different ways by attacking its own agents' authority to act on behalf of the Union. However the evidence in this case is overwhelming that both Ryerson and Alvarez had both actual and apparent authority to act on behalf of the Union. Pursuant to the parties' mutual and binding agreement that Texas law will govern all disputes, Mexican law does not apply to the determination of authority. Under Texas law, there can be no question that Ryerson and Alvarez had actual authority to enter into the Settlement Agreement. Virtually every witness testified to this fact. Indeed, Ryerson was directed by Union officials and given specific authority to settle the Arriba matters. Ryerson did as directed, and negotiated and entered into the Settlement Agreement on behalf of the Union – an agreement which inured to the benefit of the Union. Moreover, Alvarez had actual authority to bind the Union to the Settlement Agreement. Alvarez had a written power of attorney issued by the Union to act on behalf of the Union.

Additionally, Ryerson and Alvarez both had apparent authority to act on behalf of the Union. As stated, Ryerson had been the Union's attorney beginning in 1990. The Union never asserted that Ryerson was not its agent *until long after it had taken full advantage of the Settlement Agreement*. No notices were filed with the Court, nor were any communications of "termination of representation" given to Arriba to indicate the end of Ryerson's authority. In fact, Ryerson himself believed and testified that he continued to represent the Union until December, 2004. Therefore, the Union lacked ordinary care in failing to advise Arriba that Ryerson no longer had authority to represent it with regard to the Arriba matters. Arriba was justified in believing that Ryerson had authority to negotiate and enter into the Settlement Agreement on behalf of the Union. Further, the Union lacked ordinary care in failing to revoke the powers of attorney granted to its agents, Choreño and Alvarez. It was these powers of attorney upon which Arriba and Ryerson relied in negotiating and entering into the Settlement Agreement. Accordingly, there was legally sufficient evidence establishing that the Union's lack of ordinary care led Arriba to believe that Ryerson and Alvarez had authority to enter into the Settlement Agreement. The evidence at trial proved that the Union had full knowledge that Ryerson and Alvarez were acting on its behalf, and the Union permitted Ryerson and Alvarez to do so.

The trial court did not commit error by failing to submit the Union's proposed instructions on apparent authority. As set forth above, the evidence established that Ryerson and Alvarez had actual authority to enter into the Settlement Agreement on behalf of the Union. Therefore, the trial court's failure to submit the Union's proposed jury charge on apparent authority could not cause the rendition of an improper verdict. Moreover, the Texas Pattern Jury Charge used by the trial court accurately stated the law.

Furthermore, the Settlement Agreement does not lack consideration. For one, the Settlement Agreement puts an end to decades of litigation between the parties and provided the Union the opportunity to receive 48% of the $43 million that had been garnished by Arriba in New York. The Union also negotiated terms into the agreement that prohibits Arriba from enforcing the 1986 Judgment in Mexico and provided for the dismissal of the other case pending between the parties. These bargained for terms are ample consideration.

And finally, the trial court did not commit error by failing to instruct the jury on the Union's counterclaim for wrongful garnishment against Arriba. The Union has no evidence to support its wrongful garnishment claim. The Union's only evidence to support its wrongful garnishment claim is that the trial court had previously dissolved the writs of garnishment. The Union extrapolates the lower

court's decision to dissolve the writs to mean that the trial court had determined that the writs failed to meet the requirements for issuance. Not only is this statement not supported by the record, it does not establish the Union's claim of wrongful garnishment even if it were true. Consequently, the Union failed to establish the elements of a claim for wrongful garnishment. The trial court made the correct decision not to submit the Union's claim for wrongful garnishment to the jury.

The Union's approach to this appeal – like it has done throughout the history of this case in front of the trial court – has been to throw as much mud as possible against the wall in hopes something would stick. Nothing sticks. The trial court did not err to the Union's detriment. This Court should not disturb the jury verdict, which was supported by an abundance of evidence. The Union has failed to meet its burden of establishing that the trial court erred in any manner that would warrant another jury trial. As a result, this Court should affirm the jury verdict and put an end to this litigation once and for all.

**I. The Union Cannot Rely on a Foreign Declaration that Has Not Been Properly Sworn or Translated to Invalidate the Settlement Agreement**

The Union first argues that the Settlement Agreement is illegal under Mexican law because the 1986 Judgment was based on a 1984 contract that the Union contends was illegal. In support of this argument, the Union relies on the declaration of a former attorney general of Mexico, Enrique Alvarez del Castillo ("del Castillo").[6] The Union's argument is unavailing for at least five reasons.

First, the Union's argument regarding illegality is merely sleight of hand. It was not the 1984 contract that was made binding as a result of the Settlement Agreement. Rather, under the Settlement Agreement, the Union simply agreed that the 1986 Judgment was valid and enforceable. The fact that the Union now contends that the contract underlying the judgment is illegal is irrelevant. Therefore, even if Mexican law applied to the Settlement Agreement, which as set forth below it does not, del Castillo's declaration does not establish that the Settlement Agreement is illegal. Moreover, pursuant to the Settlement Agreement, the Union waived any right it had to challenge the legality of the 1986 Judgment, and

---

[6] It should be noted that Enrique Alvarez del Castillo was removed from office in May of 1991 amid charges of corruption. *See* Los Angeles Times (May 22, 1991); http://articles.latimes.com/1991-05-22/news/mn-2225_1_human-rights.

that waiver is enforceable. (18B RR 62 [DX50].) There is nothing in the declaration of del Castillo that would render that waiver unenforceable.

In addition, both the 1984 agreement that provides the basis for the 1986 Judgment and the Settlement Agreement provide that they are governed by Texas law. (18B RR 67 [DX50]; 18B RR 273 [DX120].) Therefore, Mexican law has no application to the determination regarding the legality of the 1984 agreement or the Settlement Agreement.

Third, the declaration is not properly translated. Pursuant to Texas Rule of Evidence 1009, a translation is only admissible if it is accompanied by "a qualified translator's affidavit or unsworn declaration that sets forth the translator's qualifications and certifies that the translation is accurate." Here, the purported translation of del Castillo's declaration is not accompanied by the required translator's affidavit/declaration. (*See* 3 CR 2101-2117.) Accordingly, the document is not admissible and should be disregarded by the Court of Appeals.

Similarly, the declaration is not properly sworn. Pursuant to Texas Civil Practice & Remedies Code § 132.001(c), an unsworn declaration must be "subscribed by the person making the declaration as true under penalty of perjury." Here, the declaration of del Castillo is not made "under penalty of perjury." Therefore, it is not valid under § 132.001(c) and should be disregarded in its entirety.

Finally, the cases upon which the Union relies are clearly distinguishable. Specifically, the Union relies on *United States v. Pink*, 315 U.S. 203 (1942) and *D'Angelo v. Petroleos Mexicanos*, 422 F.Supp. 1280 (D. Del. 1976) to argue that del Castillo's declaration is entitled to conclusive weight regarding the enforceability of the 1984 contract. Both of those cases dealt with the interpretation of decrees by foreign governments. In both cases, the courts gave deference to a foreign officials' interpretation of the scope and effect of foreign laws expropriating private property.

For instance, *Pink* dealt with complex issues of diplomacy and the scope of the decree nationalizing the property of private enterprises and corporations by the Soviet Government. In this context, the United States Supreme Court was willing to accept the declaration of the Commissariat of Justice, who had the power to interpret existing Russian law, that nationalization extended to the funds and property of former insurance companies. *Pink*, 315 U.S. at 219-220. Similarly, *D'Angelo* dealt with the scope of a decree by the President of Mexico that expropriated oil in Mexico owned by foreign nationals. Relying on *Pink*, the court in *D'Angelo* accepted the declaration of the Mexican attorney general regarding the scope of that decree as dispositive on that issue. *D'Angelo*, 422 F.Supp. at 1285.

This case, on the other hand, deals with the enforceability of a contract entered into by private parties *with* a choice-of-law provision freely and voluntarily agreed upon. Pursuant to the terms of both the 1984 agreement and the Settlement Agreement, that is a matter of Texas law to be determined by the Texas courts; not by a Mexican official at the request of the Mexican Union that a Texas jury and judge found to be in breach of the Settlement Agreement.

For all of these reasons, the statement of a former attorney general of Mexico, upon which the Union relies, has no application to the interpretation and/or enforcement of the Settlement Agreement.

## II. The Union's Mexican Judgment is Not a "Money Judgment" as Required to Be Enforceable Under the UFCMJRA

The Union next argues that Arriba is precluded from enforcing the Settlement Agreement based on the Uniform Foreign-Country Money Judgments Recognition Act. Although the enforceability of the Settlement Agreement had been directly at issue in front of the trial court since March, 2005, via Arriba's Motion to Enforce Settlement Agreement (1 CR 438-523), the Union sought a more favorable venue and filed its own action in Mexico in January, 2006 seeking a determination that the Settlement Agreement was not enforceable. (6 CR 4109.) Arriba was never served with process in that matter and did not appear in the action. (6 CR 4760, ¶4.) Not surprising, the Mexican court entered a declaratory judgment finding that the

18

Settlement Agreement was not enforceable under Mexican law (the "Union's Mexican Judgment"). The Union now contends that Arriba is bound by *res judicata* to the terms of the Union's Mexican Judgment under the UFCMJRA. The Union is wrong.

Simply put, the UFCMJRA does not apply to the Union's Mexican Judgment. By its terms, the UFCMJRA only applies to foreign country judgments "granting or denying a sum of money." Tex. Civ. Prac. & Rem. Code § 36.001. This has been noted by numerous Texas courts over the years. *See, e.g., Courage Co. v. Chemshare Corp.*, 93 S.W.3d 323, 330 (Tex. App. – Houst. [14th Dist.] 2002, no pet.) ("The UFCMJRA governs the recognition of foreign country ***money judgments***." [Emphasis added.]). Here, the Union's Mexican Judgment is not a money judgment. Rather, it is a judgment for declaratory relief. Therefore, the UJCMJRA does not apply to the Union's Mexican Judgment.

The requirement of a money judgment was expressly noted by the court in *Siko Ventures v. Argyll Equities, LLC*, 2005 U.S. Dist. LEXIS 21257 (W.D. Tex. 2005) when it determined that the UFCMJRA did not apply in that case. In *Siko*, the plaintiff brought an action to enforce a judgment of a Hong Kong court. In ruling on the defendant's motion to dismiss, the court noted that the Hong Kong

judgment did not fall under Texas' UFCMJRA because the Hong Kong action sought an injunction and did not seek a money judgment. *Id*. at *4.

Further, although the *Siko* court went on to find that the Hong Kong judgment could be enforced under traditional comity principles, those principles do not apply here. First, the court in *Siko* disposed of the defendant's argument that it was not subject to personal jurisdiction in Hong Kong because the defendant did not set forth any argument why there was a lack of personal jurisdiction, and because the defendant had appeared in the Hong Kong action to contest jurisdiction and lost. *Id*. at *8-9. Here, on the other hand, recognition of the Union's Mexican Judgment would violate Arriba's due process right as it was never served in the Mexican action and it did not appear in that action. (6 CR 4760, ¶ 4.)

In addition, the forum selection clause in *Siko* was permissive because it provided that the plaintiff submitted to "*non-exclusive* jurisdiction of all Federal and State Courts sitting in Kendall County." *Siko* at *14 (emphasis in original). As a result, the court found that the plaintiff was allowed to proceed in Hong Kong. *Id*. at *13-14. However, the forum selection clause in the Settlement Agreement is mandatory – "In the event any dispute arises between the parties, all parties expressly agree that any such dispute will be resolved ***exclusively*** by submission of same to a district court in Houston, Harris County, Texas." (18B RR 67 [DX50]

20

[emphasis added].)   This mandatory forum selection clause required the Union to seek relief in the District Court in Harris County, Texas, and required that Texas law would govern.   Therefore, the Union's Mexican Judgment is not enforceable under principles of comity as was the judgment in *Siko*.

A case that is on point is *Brosseau v. Ranzau*, 81 S.W.3d 381 (Tex. App. – Beaumont 2001, pet. denied), wherein the Court of Appeals refused to enforce a Mexican judgment.   In that case, the appellant sought to enforce a Mexican judgment that provided a declaration regarding the true stockholders of a corporation owning Mexican real estate.   *Id*. at 387.   Initially, the Court of Appeals correctly found that the case did not fall within the parameters of the UFCMJRA because the appellant was not asking the court to enforce the portion of the Mexican judgment requiring the appellee to pay damages.   Nevertheless, the court looked to the UFCMJRA "as persuasive if not binding authority" regarding the court's application of the common law principles of comity and collateral estoppel. [7]   *Id*. at 388.

---

[7] The Court in the present case need not look to the UFCMJRA for guidance here.   The Union argues that the Union's Mexican Judgment is *res judicata* under the UFCMJRA.   However, *Brosseau* did not involve choice-of-law and forum selection clauses like those that exist in this case.   Moreover, UFCMJRA does not apply since that judgment is not a money judgment.   The statute is clear and unambiguous on this point.   Therefore, the Court of Appeals' in *Brosseau* was wrong in looking to the UFCMJRA for guidance.   The Court's analysis can end there.

In analyzing the common law principles of comity and collateral estoppel, the court noted that "[o]ne underlying principle of comity and, by inference, the UFCMJRA, is the 'convenience, and the need for an orderly procedure in resolving jurisdictional disputes.' " *Id.* at 388 quoting *Miles v. Ford Motor Co.*, 914 S.W.2d 135, 138 (Tex. 1995). That includes the Texas common law principle that " 'the court in which the suit is first filed acquires dominant jurisdiction to the exclusion of other coordinate courts.' " *Id.* Accordingly, the Court of Appeals found that it was proper "to conclude that giving estoppel effect to a judgment obtained in a proceeding filed some six years after the court below exercised jurisdiction … would be unwarranted." *Id.* Similarly, in this case, the Union obtained the Union's Mexican Judgment almost a year after the parties began litigating the issue of the enforceability of the Settlement Agreement before the trial court. Therefore, it is also proper here not to give effect to the Union's Mexican Judgment.

Finally, the Court of Appeals in *Brosseau* also noted a provision in the UFCMJRA that is equally applicable here: Texas Civil Practice & Remedies Code § 36.005(b)(5) – a foreign judgment is not enforceable in Texas if "the proceeding in the foreign country court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court." *See Brosseau*, 81 S.W.3d at 388-390. Here, as set forth above, the

Settlement Agreement contains a mandatory forum selection clause requiring the parties to file any action arising out of the agreement with the District Court in Harris County, Texas, and for that action to be governed by Texas law. As a result, the Union's Mexican Judgment is also unenforceable.

**III.   Arriba Presented Overwhelming Evidence of Actual and Apparent Authority Sufficient to Overcome the Union's Legal Sufficiency Challenge**

In reviewing the legal sufficiency of the evidence, the Court must consider the evidence in the light most favorable to the jury's decision and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*. "As trials normally focus on issues that jurors could decide either way, reviewing courts must disregard evidence contrary to the verdict far more often than they must consider it." *Id*. at 818-819.

The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another. A reviewing court may not impose its own opinion to the contrary. *Id*. at 819. "It is the province of the jury to resolve

conflicts in the evidence. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict." *Id*. at 820.

As the party that did not have the burden of proof on the issue of authority, the Union must demonstrate that there is no evidence to support the jury's finding that Ryerson and Alvarez had actual and apparent authority to enter into the Settlement Agreement on behalf of the Union. *Reliant Energy Servs. v. Cotton Valley Compression, LLC*, 336 S.W.3d 764, 781 (Tex. App. – Houston [1st Dist.] 2011, no pet.). The Union can only meet its burden by showing that "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id*. [internal quotations and citations omitted]. Here, the evidence overwhelmingly established that Alvarez and Ryerson had both actual and apparent authority.

### A. The Union Has Failed to Establish that Mexican Law Applies to Determine the Issue of Authority

The Settlement Agreement contains a clear and unambiguous choice-of-law provision that requires the application of Texas law to the parties' dispute. (18B RR 67 [DX50].) This is in addition to the Texas forum selection clause referenced

24

above. (*Id*.) Nevertheless, the Union argues that Mexican law applies to the determination regarding whether Ryerson and/or Alvarez had authority to enter into the Settlement Agreement.[8] If the Union's argument were correct, a foreign entity – whether of a foreign state or a foreign country – could come to Texas, negotiate a contract with Texas residents in Texas,[9] contractually agree that the parties contract be governed and construed in accordance with Texas law, and then breach the contract and force the parties and the courts to apply foreign law in order to determine whether the signatory had authority to enter into the contract on behalf of the foreign entity. Fortunately, the Union is wrong regarding the application of Mexican law. The cases upon which the Union relies do not support its argument. Under Texas law, the Settlement Agreement's Texas choice-of-law provision is dispositive.

First, the Union cites to footnote one of the United States Supreme Court's opinion in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) as

[8] In making a determination regarding choice-of-law, there is a presumption that the foreign law is the same as Texas. As the party advocating the application of Mexican law, the Union bore the burden of establishing that it differed from Texas law to overcome that presumption. *Excess Underwriters at Lloyd's v. Frank's Casing Crew & Rental Tools, Inc*., 246 S.W.3d 42, 53 (Tex. 2008). The Union has failed to meet its burden in this regard.

[9] Incidentally, the only reason that Arriba is not a Texas corporation is that the Union required Arriba's initial shareholders, Bill Flanigan and David Black, who were both born and bred Texas residents, to form a Bahamian corporation in order to enter into the initial 1984 contract with the Union. (8 RR 81-83.)

support for its contention that issues such as capacity to enter into a contract are not controlled by the contract's choice-of-law provision. However, that case only addressed whether the enforceability of an arbitration clause was a matter for the court or the arbitrator to decide. It did not address which law applied to a determination of authority to contract. Moreover, in that footnote the Supreme Court made it clear that it was *not* deciding the issue of whether it was for the court or the arbitrator to decide the issue of lack of authority. *Id*. at 444 n. 1 (Supreme Court noted that "[o]ur opinion today … does not speak to the issue … [of] whether the signor lacked authority to commit the alleged principal" was for the courts to decide). Thus, this case in no way supports the Union's argument.

The Union next relies on dicta in *In re Morgan Stanley Co*., 293 S.W.3d 182 (Tex. 2009), which also involved the issue of whether the court or the arbitrator determined the enforceability of an arbitration agreement. Specifically, the Union relies on the court's discussion of a Fifth Circuit opinion that stated "that where a party attacks the very existence of an agreement ... the courts must first resolve that dispute." *Id*. at 189. However, such dicta has no precedential value. *Lester v. First American Bank*, 866 S.W.2d 361, 363 (Tex. App. – Waco 1993, writ denied). Moreover, the analysis of whether a court or arbitrator should determine the enforceability of an arbitration agreement has nothing to do with which law governs

the issue of whether an agent had authority to enter into a contract on behalf of his principal. For this reason, the Union's reliance on *Am. Med. Techs., Inc. v. Miller*, 149 S.W.3d 265 (Tex. App. – Houston [14th Dist.] 2004, no pet.) is also misplaced.

The Union next quotes the New York District Court in *Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*, 2012 WL 967301, at *5 (S.D.N.Y. 2012) – "It would make little sense to resort to law simply because it was designated by a contract provision in order to determine whether that very contract is even operative." However, that case applied New York law, which uses the "center of gravity" or "grouping of contacts" analysis rather than deferring to the parties' choice-of-law provision. *Id*. Texas law is critically different on this point.

As determined by the Texas Supreme Court in another case upon which the Union relies, *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984), a contract's choice-of-law provision is determinative. Only if there is no choice-of-law provision will Texas courts engage in a significant relationship analysis, which resembles the analysis applied in *Pegasus Aviation*. *Id*. ("in all choice of law cases, *except those contract cases in which the parties have agreed to a valid choice of law clause*, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." [Emphasis added].). *See also Scottsdale Ins. Co. v. Nat'l Emerg. Servs., Inc*. 175

S.W.3d 284, 291 (Tex. App. – Houston [1st Dist.] 2004, pet. denied) ("***Except when a contract with a valid choice of law clause applies***, Texas courts apply the substantive law of the state with the most significant relationship to the particular dispute at issue." [Emphasis added].).

Therefore, the parties' inclusion of the Texas choice-of-law provision in the Settlement Agreement requires the application of Texas law on all issues related to the governance or interpretation of that agreement. This includes the issue of Ryerson and Alvarez' authority to enter into the agreement on behalf of the Union.

**B. The Evidence Establishes that Ryerson and Alvarez Both Had Actual Authority to Bind the Union to the Settlement Agreement**

"Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess." *Suarez v. Jordan*, 35 S.W.3d 268, 273 (Tex. App.—Houston [14th Dist.] 2000, no pet.). However, the existence of actual authority may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question. *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550 (Tex. App. – Houston [14th Dist.] 2003, no pet.). In determining whether Ryerson or Alvarez had actual authority to act for the Union, the Court must examine the words and conduct by the Union to Ryerson and Alvarez regarding their authority to act for the

Union. *Reliant Energy Servs.*, 336 S.W.3d at 783. Here, there is ample evidence that the Union granted Ryerson and Alvarez authority to act on its behalf in resolving its disputes with Arriba.

There can be no dispute that Ryerson had actual authority to represent the Union with regard to its disputes with Arriba. Virtually every witness testified to this fact. The Union has a history of hiring attorneys to conduct broad aspects of its business. (*See* 10 RR 253-256.) Those attorneys are given the authority to conduct business on the Union's behalf, including retaining additional attorneys as they deem necessary. (*Id.*) Ryerson was given this broad authority.

Starting with the Union's own witnesses, one of its attorneys, George Muñoz, testified that Ryerson had been the Union's attorney with regard to the Arriba cases since 1990. (10 RR 252-253.) Ryerson had a written contract with the Union reflecting his authority to act as the Union's attorney with regard to the Arriba matters. (10 RR 257-258.) That contract was modified on a number of occasions. (10 RR 258-259.) Muñoz testified that Ryerson's representation was not terminated until late-2004 – after the Union affirmed his authority as counsel for the Union. (*See* 11 RR 8-9, 52-53, 57, 67-68; 18A RR 167 [IX 14] ["We believe that you, because of your knowledge of the problems with ARRIBA, LTD., can be an important member in the staff that Mr. Muñoz directs in the United States."]; 18A

RR 169 [IX 16] ["The purpose of this letter is to instruct you to cease any and all activities that may be interpreted or presumed as being authorized or otherwise directed by (the Union)."].) This was *after* the Settlement Agreement was executed, which was May 21, 2004. (18B RR 59 [DX 50].)

Another Union attorney, Eduardo Gonzalez, also testified that Ryerson was retained by the Union to represent it with regard to the Arriba matters and to see those matters through to conclusion. (11 RR 237-238, 241, 248.) As a part of that retention, Ryerson was authorized to bring on other attorneys to assist with the litigation. (11 RR 247-248.) One of those attorneys was Bill Burke, who was retained as trial counsel. (11 RR 252-253.) However, Ryerson continued to represent the Union, openly and notoriously. (11 RR 253-254.) Like Muñoz, Gonzalez testified regarding the numerous contracts and modifications between Ryerson and the Union regarding his representation. (11 RR 249-252.) For his work as the Union's attorney, Ryerson was paid millions of dollars. (11 RR 251-252.) Also like Muñoz, Gonzalez testified that the Union re-affirmed that Ryerson was still its attorney at least as late as November, 2004, and that he was not terminated until the fall of 2004. (11 RR 257, 263; 12 RR 61.)

Bill Burke, who at one point was trial counsel for the Union in the Arriba cases, testified that he was hired by Ryerson. (13 RR 87.) Burke confirmed that

Ryerson was present for the Union at the trial in a related Arriba case in 1997. (13 RR 119, 138.) Burke further testified that Ryerson continued to represent the Union even after he went to work for Enron. (13 RR 138.) Finally, Burke testified that he and Ryerson likely discussed the fact that $43 million had been seized in a Union bank account in New York in 2003. (13 RR129-130.) When Ryerson took the stand, he confirmed that this discussion did occur and was undertaken as a part of his representation of the Union. (11 RR 168-169.) Moreover, when Burke was relieved as counsel for the Union, the Union filed a document with the trial court removing Burke as a counsel of record for the Union. The Union never filed anything similar with regard to Ryerson at any time before the subject Settlement Agreement was signed. (8 RR 60-61.) This is because Ryerson remained the Union's attorney throughout this time. There can, therefore, be no question that Ryerson had full authority to act on behalf of the Union when he signed the Settlement Agreement.

In terms of Arriba's representatives, David Black, who is an Arriba shareholder and was Arriba's attorney who secured the 1986 Judgment, testified that Ryerson was constantly the Union's attorney going back to 1990. (8 RR 55-57, 70.) From 1990 through 2004, Ryerson was a constant as the Union's primary attorney in these matters. (8 RR 71-72, 184-185.) This included during an 18

month period while Ryerson worked for Enron, during which time Black met with him as the Union's attorney. (8 RR 61.) Although Ryerson hired Burke as trial counsel for the Union (8 RR 222), Ryerson still appeared at the 1997 trial on behalf of the Union. (8 RR 57.) This arrangement was not unusual for the Union, as Muñoz was the Union's lead counsel at the trial below and was present at the trial, but he did not participate in actually trying the case, nor did he sit at counsel table. (10 RR 233.) Black further testified that while the Union provided notice that Burke was no longer its attorney, it never provided notice that Ryerson was no longer its attorney. (8 RR 60-61.)

One of Arriba's subsequent attorneys, Stan Nelson, also dealt with Ryerson throughout his representation of Arriba. In fact, Nelson testified that when he became involved in the cases in 1999 through 2004, Ryerson was the Union's top lawyer. (9 RR 184.) Nelson was given this impression by reading the files, speaking with his clients, and by speaking with Burke. (10 RR 44-46.) Ryerson was the Union's lead lawyer with regard to the Arriba matters. (9 RR 157, 161.) Further, Nelson was aware that Ryerson had hired Burke to represent the Union. (9 RR 157; 10 RR 184-185.)

Nelson continued to communicate with Ryerson regarding the cases after Burke was retained to represent the Union in the litigation with Arriba. (10 RR 25.)

He continued to communicate with Ryerson after Ryerson went to work at Enron, and even after Muñoz replaced Burke as the Union's litigation attorney in 2003. (9 RR 185-186.) In fact, Gomez, as Receiver for Arriba, testified that Ryerson was the only attorney for the Union that he had ever met. (9 RR 97-98.)

After Nelson garnished the Union's funds in New York, Ryerson reached out to him on behalf of the Union to discuss the possible resolution of the parties' disputes. (9 RR 159-161.) Because Ryerson was the Union's attorney, there was nothing unusual about Nelson negotiating the Settlement Agreement with him. (9 RR 189-190.)

Finally, Ryerson testified that he was retained in 1990 by both the Union and its Commission of Contracts in order to resolve all of the pending litigation with Arriba. (11 RR 153-156.) Ryerson was hired by Ruben Choreño, who was the Union's long-time attorney under a very broad general power of attorney from the "Sindicato" that Ryerson had seen.[10] (12 RR 114-115; 18A RR 53 [PX 22].) Choreño also verified pleadings for the Union in the various Arriba cases. (*See, e.g.,* 11 RR 159-160, 173; 18A RR 57-58 [PX29].)

---

[10] It should be noted that Ryerson speaks fluent Spanish and could read the Sindicato's written grant of a power of attorney. (11 RR 150.)

After he hired Burke, Ryerson helped Burke in defending the Union in the Arriba actions. (12 RR 130-131.) Ryerson represented the Union at the trial in 1997, and through the appeal in that matter. (11 RR 166-167; 12 RR 109-110.) Ryerson testified that he continued to represent the Union after he went to work at Enron. (11 RR 167.) In fact, his continued representation of the Union was part of his agreement with Enron. (11 RR 167-168.)

By 2002, Deschamps and the number two person at the Union, Ricardo Aldana Prieto, had been indicted in Mexico for embezzling the $43 million that was located in New York, for electoral fraud, and for violation of public trust.[11] (10 RR 249-250; 11 RR 169-171.) Those charges were not dropped until 2006. (11 RR 18.) A Union representative testified that such an indictment could result in a Union official losing his office. (10 RR 221-222.) Ryerson testified that this is exactly what happened when Deschamps and Prieto were indicted. (11 RR 209.) The Union's leadership was in turmoil. (11 RR 171-172.)

As a result, Ryerson was approached by Choreño, who was still operating under the general power of attorney granted by the "Sindicato." (11 RR 172-173; 18A RR 53 [PX 22].) That general power of attorney "for suits and collection"

---

[11] As noted above, Ryerson witnessed similar corruption by Deschamps first hand. (*See* 12 RR 97-103; 133-134.)

granted Choreño the authority to "compromise" on behalf of the Union, among other things.[12] (18A RR 50 [PX 22].) Choreño was acting at the request of La Quiña, who was the founder and long-time president of the Union. (11 RR 174-175.) Ryerson had a discussion with the administration of the then President of Mexico, Vincente Fox, who told him that he should deal with La Quiña and Choreño with respect to the Arriba litigation because they had been asked to handle the issues with the Union and Pemex, and to try to make sure the money in New York would go back to the Union. (11 RR 177-178; 12 RR 112, 138-139.) At that time, Ryerson was told by officials of the administration and others with authority in the Union that Deschamps was going to jail and that he was not to speak with Deschamps or any of his associates. (11 RR 177-178; 12 RR 173-174, 179-180.) This made sense because they were under indictment for, in part, the $43 million which had been embezzled to New York and garnished, and they no longer had authority to act for the Union. (11 RR 178; 210-211.)

Ultimately, Ryerson was directed by these Union officials and given specific authority to settle the Arriba matters. (11 RR 178-179, 210-213; 12 RR 117-118,

---

[12] The Union argues that this power of attorney is not valid under Texas law because there was no evidence that it was signed by the Union. Not only does that document speak for itself – it is signed (18A RR 52, 55 [PX 22]) – but the Union's own attorney testified that it was a power of attorney granted by the Union. (13 RR 46-48.)

137-138; 18A RR 45 [PX 16].) In fact, Ryerson was given specific written instructions by Alvarez, on behalf of the Union, to "take all necessary measures to bring to a good conclusion the negotiations as may be pertinent … with the representative(s) of the company 'Arriba limited.' " (18A RR 45 [PX 16].) Ryerson did as directed, and negotiated and entered into the Settlement Agreement on behalf of the Union. (11 RR 180-182; 12 RR 119-120.)

Thus, there was clear and overwhelming evidence that Ryerson was the Union's attorney with regard to the Arriba cases from 1990 through December, 2004. The evidence also establishes that Ryerson had specific authority to enter into the Settlement Agreement. Moreover, as the Union's attorney, Ryerson is presumed to have had actual authority to enter into the Settlement Agreement on behalf of the Union. *City of Roanoke v. Town of Westlake*, 111 S.W.3d 617, 629 (Tex. App. – Fort Worth 2003, pet. denied). Although this presumption may be rebutted (*id.*), the conflicting testimony on this issue must be resolved in favor of affirming the jury's finding of actual authority. *See City of Keller*, 168 S.W.3d at 819 ("Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it."). Therefore, the Court should find that the evidence was

legally sufficient to support the jury's finding that Ryerson had actual authority to enter into the Settlement Agreement on behalf of the Union.

The evidence was also legally sufficient so support the jury's finding that Alvarez had actual authority to bind the Union to the Settlement Agreement. As noted above, Ryerson was instructed by La Quiña and Choreño, on behalf of the Union, to settle the Arriba matters. (11 RR 177-179, 210-213; 12 RR 117-119, 137-138; 18A RR 45 [PX 16].) Ryerson was told to deal specifically with Alvarez as the Union's representative. (11 RR 206-207.) To this end, Ryerson was presented with a written power of attorney issued by the Union in favor of Alvarez. (11 RR 182-183.) The existence of Alvarez' power of attorney was recognized in Exhibit B to the Settlement Agreement. (18B RR 89-92 [Alvarez "concurs in this act as general attorney in fact of the Oil Workers of the Mexican Republic's Union"; "who appears in his condition of attorney in fact"; "in his condition of attorney in fact"; "it is issued for [Alvarez], in his capacity of attorney in fact of the Oil Workers of the Republic of Mexico's Union"].) That power of attorney granted Alvarez the authority "to litigate and collect," including the power "to celebrate all kinds of contracts," among other things. (18B RR 91 [DX 50].)

The Union has ignored all of this evidence and has instead focused on other testimony it claims shows that the Union never granted Ryerson or Alvarez the

authority to enter into the Settlement Agreement. In particular, the Union relies on the testimony from its witnesses that Deschamps remained in power even after he was indicted. This is the shell game that the Union plays. It enters into agreements using one or more of its authorized agents. It clothes the agents in every way as having full written power of attorney. It knowingly permits these agents to represent themselves as agents of the Union, including statements made in court. Then, if and when the Union subsequently breaches its agreements, it simply contends that its agents were not authorized to enter into that particular transaction. Nevertheless, the Court must assume that jurors resolved all conflicts in accordance with their verdict that Ryerson and Alvarez had actual authority if reasonable human beings could do so. *City of Keller*, 168 S.W.3d at 819.

The jury was presented with legally sufficient evidence to support its verdict that Ryerson and Alvarez had actual authority from the Union to enter into the Settlement Agreement. Therefore, the jury's verdict must be upheld.

### C. The Evidence Establishes that Alvarez and Ryerson Both Had Apparent Authority to Bind the Union to the Settlement Agreement

In the event the Court does not find that there was legally sufficient evidence of Ryerson and Alvarez' actual authority to enter into the Settlement Agreement, which it should not, there was legally sufficient evidence to support the jury's verdict that these individuals had apparent authority to bind the Union. "While

actual authority is created by written or spoken words or conduct by the principal to the agent, apparent authority is created by written or spoken words or conduct by the principal to a third party."  *Walker Ins. Servs.*, 108 S.W.3d at 550.

> Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise.

*Reliant Energy Servs.*, 336 S.W.3d at 784.   "In determining whether an agent had apparent authority, a court considers only the conduct of the principal that would lead a third party to believe the agent had apparent authority."  *Walker Ins. Servs.*, 108 S.W.3d at 551.

Apparent authority is based on estoppel.  *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).  Therefore, the party asserting apparent authority as a basis for recovery must show justifiable reliance on the principal's words or conduct resulting in harm to the party.  *Reliant Energy Servs.*, 336 S.W.3d at 784.  Moreover, the principal must have full knowledge of all material facts in order to establish a claim of apparent authority.  *Gaines*, 235 S.W.3d at 182.  In this case, each of these elements is supported by legally sufficient evidence.

1. <u>The Union's Lack of Ordinary Care Led Arriba to Believe that Ryerson and Alvarez had Authority to Enter Into the Settlement Agreement</u>

As set forth above, Ryerson began as the Union's attorney in 1990. Muñoz, Gonzalez, and Burke all testified unequivocally that Ryerson was the Union's attorney and was responsible for the Arriba cases. Black and Nelson testified that they continued to interact with Ryerson regarding these cases through the date of the Settlement Agreement – after Ryerson hired Burke and even after Ryerson went to work for Enron. When Burke's representation of the Union ended, the Union filed notices with the trial court to that effect. (18A RR 37-42 [PX 8, 9]; 13 RR 148.) However, at no time prior to December, 2004 did anyone tell Arriba or its attorneys that Ryerson was not authorized to act on behalf of the Union.[13] (9 RR 170-175.) No notices were filed with the Court, nor were any communications of "termination of representation" given to Arriba. In fact, Ryerson himself believed and testified that he continued to represent the Union until December, 2004. (12 RR 123-124.) Instead, the Union was silent. The Union lacked ordinary care in failing to advise Arriba that Ryerson no longer had authority to represent it with regard to the Arriba

---

[13] The Union never informed Arriba that Ryerson no longer had authority because, as established above, he continued to maintain that authority at least until December-2004. (12 RR 122-124.)

matters. This led Arriba to believe that Ryerson had authority, as he always had, to negotiate and enter into the Settlement Agreement. (9 RR 189-190.)

In addition, the Union lacked ordinary care in failing to revoke the powers of attorney granted to Choreño and Alvarez.[14] It was these powers of attorney upon which Arriba and Ryerson relied in negotiating and entering into the Settlement Agreement. (10 RR 60-61, 138-139; 11 RR 172-173, 182-183; 12 RR 147-149.)

Accordingly, there was legally sufficient evidence establishing that the Union's lack of ordinary care led Arriba to believe that Ryerson and Alvarez had authority to enter into the Settlement Agreement.

2. <u>Arriba Justifiably Relied on the Union's Lack of Ordinary Care to Its Detriment</u>

In light of Ryerson's nearly 15 years as the Union's attorney, coupled with the powers of attorney issued to Choreño and Alvarez, Arriba was justified in relying on Ryerson as an agent for the Union to Arriba's detriment. The Union's lack of ordinary care resulted in Arriba justifiably relying on Ryerson and Alvarez, thereby entering into the Settlement Agreement. This reliance was to Arriba's detriment as it has not been able to enjoy the benefit of its bargain with the Union as set forth in the Settlement Agreement. Instead, Arriba remains mired in litigation with the

---

[14] As also established above, the Union did not revoke these powers of attorney because Choreño and Alvarez maintained actual authority to act on the Union's behalf.

Union, as it has been for 30 years now. Therefore, there was legally sufficient evidence establishing the requirement for a finding of apparent authority.

### 3. The Union Had Full Knowledge That Ryerson and Alvarez Were Acting on Its Behalf

The final requirement for a finding of apparent authority is that the Union had full knowledge of all material facts. *Gaines*, 235 S.W.3d at 182. As set forth above, the Union, through La Quiña and Choreño, instructed Ryerson to settle the Arriba matters. (11 RR 178-179, 210-213; 12 RR 117-119, 137-138; 18A RR 45 [PX 16].) They also directed Ryerson to deal with Alvarez as the Union's representative. (11 RR 206-207.) Therefore, the Union knew Ryerson and Alvarez were working to resolve its disputes with Arriba.

While the Union may disagree with this evidence, and would rather rely on the testimony of its attorneys,[15] the Court must assume that the jury resolved these conflicts in evidence in favor of apparent authority. *City of Keller*, 168 S.W.3d at 819. As a result, there was legally sufficient evidence to support the jury's finding that Ryerson and Alvarez both had apparent authority to enter into the Settlement Agreement on behalf of the Union.

---

[15] The Union did not call real witnesses like Deschamps. Instead, the Union relied on the testimony of three of its lawyers, which the jury obviously concluded were not credible.

**IV.    The Settlement Agreement is Supported by Adequate Consideration**

Ignoring the express terms of the Settlement Agreement, the Union continues to argue the agreement lacks adequate consideration.   This simply is not the case.

Consideration is a bargained for exchange of promises.  *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991).   Consideration consists of benefits and detriments to the contracting parties. *Id.*   "A single consideration is sufficient to support multiple promises bargained for in an agreement."   *Birdwell v. Birdwell*, 819 S.W.2d 223, 228 (Tex. App. – Fort Worth 1991, writ denied). Moreover, where there is a written contract, consideration for its execution is presumed.  *Blockbuster, Inc. v. C-Span Entertainment, Inc.*, 276 S.W.3d 482, 488 (Tex. App. – Dallas 2008, pet. granted).   As the party alleging lack of consideration, the Union had the burden to rebut that presumption.   *Id.*   The Union has failed to meet its burden.

The Settlement Agreement is a written contract that is ripe with consideration. At the most basic level, the Settlement Agreement put an end to decades of litigation between the parties.   However, the Settlement Agreement also provided the Union with the opportunity to receive 48% of the $43 million that had been garnished by Arriba in New York as "further consideration for this Agreement."   (18B RR 61-62 [DX 50].)   The Settlement Agreement was entered into at a time when there was no

guarantee that the Union would get *any* of this money back. The fact that the garnishments were subsequently dissolved is irrelevant – hindsight is 20-20.

The Union was also able to negotiate terms into the agreement that prohibits Arriba from enforcing the 1986 Judgment in Mexico. Specifically, pursuant to Article IV(B), since the Union failed to distribute the garnished funds as required by the agreement, Arriba can enforce the 1986 Judgment against the Union "anywhere in the world, except in the country of Mexico." (18B RR 62 [DX 50].) The benefit received by the Union is all the more apparent in light of the jury's verdict – a judgment that Arriba cannot enforce in Mexico. With the return of the garnished funds to Mexico, Arriba must search outside of Mexico for assets with which to enforce its judgment.

Under Article V, the Union's failure to distribute the garnished funds under the agreement resulted in the mutual dismissal of the 1989 litigation. However, if the Union distributed the garnished funds to Arriba as was required, the dismissal of the 1989 litigation was at the Union's option. (18B RR 63 [DX 50].) These bargained-for exchanges are exactly what the Union wanted since it never intended to perform under the Settlement Agreement.

Thus, even a cursory review of the terms of the Settlement Agreement reveals that it is supported by adequate consideration. Accordingly, the Union's appeal on this ground should be rejected.

**V.    The Union Has Failed to Establish a Basis for the Court to Reverse and Remand for a New Trial**

**A. The Trial Court Did Not Abuse Its Discretion in Excluding the Union's Evidence Regarding Mexican Law**

A trial court's evidentiary rulings are reviewed for abuse of discretion. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). Abuse of discretion occurs when the trial court acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241-42 (Tex. 1985). Even if an evidentiary ruling is erroneous, the Court should not reverse unless the erroneous ruling probably caused the rendition of an improper judgment. *See Auld*, 34 S.W.3d at 906. "Reversible error in connection with rulings on questions of evidence usually does not occur unless the complaining party can demonstrate that the whole case turned on the evidence that was admitted." *Reliant Energy*, 336 S.W.3d at 793.

As established above, Mexican law does not apply in this case in light of the Settlement Agreement's Texas choice-of-law provision. Since Mexican law has no application in this case, evidence regarding Mexican law is irrelevant. Tex. R. Evid. 401, 402. Moreover, any minimal probative value Mexican law may have

had would have been "substantially outweighed" by the danger of unfair prejudice, confusion of the issues, misleading the jury, and by considerations of delay. Tex. R. Evid. 403. Therefore, the trial court did not abuse its discretion in refusing to admit the Union's evidence regarding Mexican law. As a result, the Court should also reject the Union's appeal on this issue.

## B. Any Error in Instructing the Jury Regarding Apparent Authority, if Any, Was Harmless

A trial court's decision to submit or refuse a particular instruction is reviewed under an abuse of discretion standard. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). "The trial court has considerable discretion to determine proper jury instructions, and '[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper.' " *Id*. quoting *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). In this case, the Court should not reverse the judgment for a charge error unless that error was harmful because this Court determines that it "probably caused the rendition of an improper judgment. *Thota*, 366 S.W.3d at 687 quoting Tex. R. App. P. 44.1(a)(1). The Union bears the burden of establishing the error was harmful. *See*

*Crescendo Invs. v. Brice*, 61 S.W.3d 465, 477 (Tex. App. – San Antonio 2001, pet. denied) ("[appellant] has the burden to show the error probably caused the rendition of an improper judgment.").

Here, the trial court instructed the jury on apparent authority using Texas Pattern Jury Charge 101.4. (14 CR 7630-7631.) This is an accurate statement of the law in Texas. *See Gaines*, 235 S.W.3d at 182-183. Although the Union contends that the instruction was not complete in light of *Gaines*, the Union has failed to present any evidence of argument establishing how the trial court's refusal to submit its proposed instructions "probably caused the rendition of an improper judgment." In fact, as set forth above, the evidence established that Ryerson and Alvarez had actual authority to enter into the Settlement Agreement on behalf of the Union. Therefore, the trial court's failure to submit the Union's proposed jury charge on apparent authority could not cause the rendition of an improper verdict.

Moreover, as also set forth above, the evidence submitted to the jury established that: (1) the Union's lack of ordinary care led Arriba to believe that Ryerson and Alvarez had authority to enter into the Settlement Agreement; (2) Arriba justifiably relied on the Union's lack of ordinary care to its detriment; and (3)

the Union had full knowledge of all material facts.[16]   Therefore, there was no harmful error due to the trial court's refusal to use the Union's proposed charge to instruct the jury regarding apparent authority.

Applying the principles in *Columbia Rio Grande Healthcare*, *supra*, the trial court's charge to the jury regarding apparent authority was proper because it assisted the jury in determining the applicable law to apply to this case, it accurately stated the law in Texas regarding apparent authority as set forth in Texas Pattern Jury Charge 101.4, and the instruction was supported by the pleadings and evidence.

Finally, the Union has failed to offer any evidence or argument demonstrating that the jury may have had an inaccurate impression that Ryerson's status as the Union's attorney improperly clothed him with authority to enter into the Settlement Agreement.

For all of these reasons, the Union has failed to meet its burden of proving harmful error.   Therefore, there is no basis for the Court to find that the trial court's charge to the jury probably caused the rendition of an improper judgment.

---

[16] Despite the Union's claim to the contrary, the trial court did instruct the jury regarding the reasonably prudent person standard.   (14 CR 7630.)

## C. The Evidence Was Factually Sufficient to Support the Jury's Findings on Actual and Apparent Authority

In reviewing a jury's verdict for factual sufficiency, an appellate court must examine both the evidence supporting and contrary to the judgment. *Reliant Energy*, 336 S.W.3d at 781. However, the jury remains the sole judge of witnesses' credibility, and it may choose to believe one witness over another. A reviewing court may not impose its own opinion to the contrary. *Id*. at 781-782. "In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the party did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust." *Id.* at 782.

Here, the evidence was not only legally sufficient, as established above, it was also factually sufficient. The jury clearly believed the testimony presented regarding Ryerson and Alvarez' actual and apparent authority. That evidence was strong and persuasive, and certainly not so weak as to make the verdict clearly wrong and manifestly unjust. Therefore, the Union's factual sufficiency challenge should be denied.

## D. The Trial Court Did Not Error in Denying the Union's Motion for Mistrial

The Union next challenges the trial court's denial of its motion for mistrial based on its contention that Arriba and Ryerson did not timely disclose certain

evidence. A trial court's denial of a mistrial is reviewed for abuse of discretion. *Lewis v. United Parcel Serv., Inc.*, 175 S.W.3d 811, 815 (Tex. App. – Houston [1st Dist.] 2004, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Here, the Union argues that Arriba failed to identify the attorney for Arriba's Receiver in the Bahamas, Ruth Bowe-Darville, as a potential witness and failed to produce requested documents regarding Arriba's claims that Ryerson and Alvarez had ***authority***. The Union contends that this information was then wrongfully disclosed to the jury during Gomez and Nelson's testimony. Contrary to the Union's claims, Gomez and Nelson only testified regarding Bowe-Darville's assistance in confirming Ryerson and Alvarez' ***identity*** when they arrived in the Bahamas to sign the Settlement Agreement. This testimony was entirely consistent with Arriba's discovery responses.

Specifically, the Union's motion is based on its Interrogatory Nos. 8 and 9 and Requests for Production Nos. 35 and 37. (*See* 13 CR 7418-7419.) All of this discovery went to Arriba's contention that Ryerson and Alvarez had authority to enter into the Settlement Agreement on behalf of the Union. (*Id.*) Arriba responded that Nelson verified their authority and that both Gomez and Black were

fully aware that Ryerson had been the Union's long-standing attorney. (13 CR 7418.) Arriba also produced responsive documents.

The Union claims that Gomez and Nelson improperly testified that Bowe-Darville had a "dossier" with Alvarez' passport *and* verified his authority to bind the Union. This simply is not true. Importantly, all of this testimony was elicited by the Union's attorney and he was the one who used the term "dossier." (9 RR 42-43, 213.) Arriba did not seek to introduce the testimony in the first instance. *C.f. In re City of Houston*, 418 S.W.3d 388, 396 (Tex. App. – Houston [1st Dist.] 2013, orig. proceeding) (trial court abused its discretion in granting new trial where party that did not disclose evidence did not seek to use the undisclosed evidence).

In addition, the term "dossier" is one the Union came up with in order to try to create an appellate issue. (*See* 14 RR 9.) Gomez merely testified that, in most cases, his Bahamian attorney would assemble documentation regarding individuals with whom he was doing business. (9 RR 43-44.) However, despite the Union's attorney's attempts to get Gomez to confirm that such a "dossier" was created in this instance reflecting Alvarez' background, Gomez only testified that he would have reviewed such documents if they existed. (*Id.*) In fact, there was no dossier in this instance. (14 RR 9.) Moreover, the Union was aware of Alvarez' passport

number throughout this litigation as it appears on the power of attorney, which is attached as Exhibit B to the Settlement Agreement. (18B RR 89-90 [DX 50].)

Under examination by the Union's attorney, Nelson testified that Bowe-Darville did not do anything beforehand in terms of due diligence, but that she "may have made sure they were who they said they were when they arrived." (9 RR 213.) Thus, Arriba responded truthfully and completely to the Union's discovery. However, even if Arriba's discovery responses were somehow lacking, which they were not, Gomez and Nelson's testimony was nonetheless admissible under Texas Rules of Civil Procedure 193.6(a) since the Union knew of Alvarez' passport number from Exhibit B to the Settlement Agreement and also knew about the existence of Bowe-Darville as Arriba's Bahamian attorney, who Gomez identified and discussed numerous times during his deposition. (14 RR 9-10.)

The Union next argues that the trial court should have granted a mistrial based on Ryerson's failure to produce an affidavit regarding a cash payment Ryerson received from the Union in 1992. Initially, as the Union concedes, the trial court did not admit the affidavit into evidence. Therefore, the trial court did not abuse its discretion in denying the Union's motion for mistrial.

In addition, as argued by Ryerson's attorney to the trial court, the affidavit was not responsive to any of the Union's requests. (*See* 13 CR 7517-7522;

Appellant's Brief p. 69; 14 RR 18-22.) Ryerson brought the affiant with him to Mexico because he wanted a witness to the fact that he was getting less than the $3.5 million he was supposed to be paid by the Union for U.S. IRS tax purposes. (12 RR 100-101; 14 RR 18.) Thus, the affidavit was not made with regard to a dispute with the Union and it was not a part of Ryerson's Union file. (13 CR 7521-7522.) Further, Ryerson did not intend to call the affiant because he had passed away. (14 RR 20-21.) Finally, Ryerson did not intend to use the affidavit at trial, and he objected to the Union's broad request for "[a]ll exhibits you intend to use at trial" on work product grounds. (13 CR 7518; 14 RR 18.)

For all of these reasons, the trial court did not abuse its discretion in denying the Union's request for a mistrial.

### E. The Court Properly Refused to Instruct the Jury Regarding the Union's Counterclaims

The Union's final charge of error is that the trial court improperly refused to instruct the jury on its counterclaims for wrongful garnishment against Arriba and breach of fiduciary duty against Ryerson. Ryerson is in a better position to address the Union's claim regarding breach of fiduciary duty.[17] With regard to the Union's

---

[17] In the event the Court finds that the trial court should have instructed the jury on the Union's breach of fiduciary duty claim, the Court should only reverse that portion of the judgment and leave the rest intact. Tex. Rul. App. Proc. 44.1(b).

claim for wrongful garnishment, the trial court was correct in not submitting that issue to the jury.

Arriba moved for directed verdict on the Union's claim for wrongful garnishment. (14 RR 50.) The trial court's decision not to submit the issue to the jury was the result of the trial court granting Arriba's motion. Unfortunately, the record does not reflect this fact because the trial court took the proceeding off record. (*Id.*) Accordingly, the Court should review this issue under the standard for reviewing a directed verdict.

In reviewing a directed verdict, the standards are the same as a legal sufficiency challenge. *City of Keller*, 168 S.W.3d at 823. To reiterate, "[i]f the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*. at 822. "It is the province of the jury to resolve conflicts in the evidence. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict." *Id*. at 820.

The only evidence the Union cites in support of this challenge is the fact that the trial court granted the Union's motion and released Arriba and Ryerson's writs

of garnishment. The Union then contends that the trial court determined that the writs failed to meet the requirements for issuance. Not only is this statement not supported by the record, it does not establish the Union's claim even if it were true.

First, the court's order simply states that it is of the opinion that the Union's motion is well taken and sustains the motion to dissolve the writs of garnishment. (4 CR 3379-3380.) The Union's motion to dissolve Arriba's writ was based on four arguments, the Union arguing that any one of which would provide a basis to dissolve the writ: (1) Arriba's application for the writ was defective; (2) the affidavit/verification supporting the writ was inadequate; (3) the garnished funds were *in custodia legis* and were not subject to garnishment; and (4) Arriba's application contained false information. (4 CR 3139.) However, there is nothing in the record to indicate which one of these arguments provided the basis for the trial court's order releasing the writs of garnishment. (4 CR 3379-3380.) Therefore, the fact that the trial court released the writs of garnishment does not establish the Union's claim.

In addition, a garnishment is only wrongful if the facts set forth in the affidavit are false or if the debt or judgment alleged to be the basis for the garnishment is non-existent or not sufficient to support the writ. *Aetna Cas. & Sur. Co. v. Raposa*, 560 S.W.2d 106, 109 (Tex. App. – Fort Worth 1977, writ dism'd). Even if the trial

court released the writs because the requirements for issuance were not met, there is no indication which requirements the trial court believed were lacking. Thus, the trial court's order dissolving the garnishment does not establish the elements required for a claim for wrongful garnishment. As such, the Union's claim of error could not have caused the rendition of an improper judgment as required by Rule 44.1(a)(1) of the Texas Rules of Appellate Procedure.

The Union will likely rely on *Texas Commerce Bank N.A. v. Tripp*, 516 S.W.2d 256 (Tex. Civ. App. – Fort Worth 1974, writ dism'd.) to argue that Arriba's writ of garnishment was wrongful because the 1986 Judgment had been released as a part of Arriba's agreement with Comater. Initially, *Texas Commerce Bank* involved a prejudgment writ of garnishment. *Id*. at 257. Arriba's writ of garnishment was based on the 1986 Judgment, which is a final judgment. More importantly, however, Black testified that the Comater agreement was rescinded and the 1986 Judgment was reinstated. (8 RR 196-197.) Black's testimony was further supported by documentary evidence of the April, 2002 agreement between Arriba and Comater reinstating the 1986 Judgment. (18A RR 31-33 [DX 7].) Arriba did not apply for its writ of garnishment until May, 2002. (1 CR 24.) Therefore, at the time Arriba made its application, the 1986 Judgment was valid and in effect.

Finally, the other cases relied upon by the Union do not support reversing the trial court in this case. In *Chandler v. Cashway Bldg. Materials, Inc.*, 584 S.W.2d 950 (Tex. Civ. App. – El Paso 1979, no writ), the court found that the garnishment was wrongful because some of the facts in the affidavit supporting the garnishment were untrue. *Id.* at 952-953. Similarly, in *Peerless Oil & Gas Co. v. Teas*, 138 S.W.2d 637 (Tex. Civ. App. – San Antonio 1940, jdgmt. aff'd.), the jury found that the garnishment was wrongful and that the defendant acted with malice. Here, on the other hand, the Union's only evidence to support its claim was the fact that the trial court had previously dissolved the writ of garnishment. As set forth above, however, this does not establish the elements of a claim for wrongful garnishment.

For all of these reasons, the Court should not reverse based on the trial court's decision not to submit the Union's claim for wrongful garnishment to the jury.

## CONCLUSION AND PRAYER

The Union has failed to meet its burden of establishing that the trial court erred in any manner that would warrant reversing the judgment entered in this case.

WHEREFORE, PREMISES CONSIDERED, Appellee/Cross-Appellant James Gomez, as Receiver for Arriba Limited, respectfully prays that this Court deny the appeal by Appellant and Cross-Appellee The Petroleum Workers Union of the Republic of Mexico in its entirety.

Appellee/Cross-Appellant further prays for such other and further relief that it may be justly entitled.

Respectfully submitted,

CALHOUN, BHELLA & SECHREST, LLP

By:   */s/ Brian Calhoun*
    **Brian Calhoun, Esq.**
State Bar No. 24044827
325 N. Saint Paul Street, Suite 2300
Dallas, Texas 75201
Telephone: 214.981.9200
Facsimile: 214.981.9203
Email: bcalhoun@cbsattorneys.com

Michael J. Pérez, Esq.
Pérez & Wilson, Inc.
750 B Street, Suite 3300
San Diego, California 92101
Telephone: 619.741.0282
Facsimile: 619.460.0437
Email: perez@perezwilson.com

Steven Ward Williams, Esq.
Smith Sovik Kendrick & Sugnet, PC
250 South Clinton Street, Suite 600
Syracuse, New Work 13202-1252
Telephone: 315.474.2911
Facsimile: 315.474.6015
Email: swilliams@smithsovik.com

**ATTORNEYS FOR PLAINTIFF JAMES GOMEZ, AS RECEIVER FOR ARRIBA LIMITED**

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief is in compliance with Texas Rule of Appellate Procedure 9.4 because it contains 14,138 words and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font for text and 12-point Times New Roman font for footnotes, which meets the typeface requirements.

*/s/ Brian Calhoun*
Brian Calhoun

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this brief was served on all counsel of record electronically on September 24, 2015.

Michael Choyke
State Bar No. 00793504
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas   77056
(713) 572-4321
(713) 572-4320 (fax)
choyke@wrightclose.com

Paul Simon
State Bar No. 24003276
SIMON HERBERT & MCCLELLAND, LLP
3411 Richmond Ave., Ste. 400
Houston, Texas 77046
(713) 987-7100
(713) 987-7120 (fax)
psimon@shmsfirm.com

Carlos Ryerson
RYERSON & ASSOCIATES, P.C.
The Kirby Mansion
2000 Smith Street
Houston, Texas 77002-8652
(713) 307-9900
(832) 383-9320 (fax)
carlos.ryerson@ryersonlaw.com

*/s/ Jeffrey A. Feasby*
Jeffrey A. Feasby